In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1582

Staceen M. Sinkler,

Plaintiff-Appellant,

v.

Midwest Property Management
Limited Partnership,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 247--John W. Reynolds, Judge.

Argued December 2, 1999--Decided April 6, 2000

        Before Ripple, Kanne and Diane P. Wood, Circuit
Judges.

        Kanne, Circuit Judge.  Staceen Sinkler suffers
from a "specific phobia" involving the operation
of an automobile. Her condition makes her unable
to drive anywhere unfamiliar to her, and on at
least two occasions, her phobia forced her
employer, Midwest Property Management Limited
Partnership ("Midwest"), to make alternate travel
arrangements so she could perform her job as
regional sales manager. Midwest ultimately
discharged Sinkler. Sinkler filed suit against
Midwest, alleging that Midwest discharged her
because of her phobia and failed to make
reasonable accommodations for her condition, in
violation of the Americans with Disabilities Act
("ADA").

        Midwest moved for summary judgment, arguing that
Sinkler was not a qualified individual with a
disability within the meaning of the ADA because
Sinkler's specific phobia did not substantially
limit her major life activity of working. The
district court granted Midwest's motion. Sinkler
appeals, and we affirm.

I.  History

        Staceen Sinkler's specific phobia causes her
intense anxiety, distress, avoidance and feelings

of derealization when she must drive in an unfamiliar area. Because of these "spontaneous panic attacks," Sinkler's condition requires her to take alternate forms of transportation or to travel as a passenger on trips from her home in Kenosha, Wisconsin, to such nearby cities as Milwaukee or Chicago. Sinkler has always had a fear of driving. Sinkler's physician Dr. V. K. Sharma diagnosed her condition in 1983 as a "phobia" and in 1986 as "spontaneous panic attacks." Her phobia always has hindered her ability to secure employment that would require her to drive outside of Kenosha.

Sinkler's fear of driving has not stymied her ability to work within Kenosha. In fact, she has worked within the city for more than thirty years. She has held sales jobs for many employers, serving as a sales representative for a nursing home and as sales manager/representative for Best Western in Kenosha. Her previous employers knew about her fear of driving and did not require her to drive outside of the city. However, she has been forced to decline promotions when non-local travel would have been required.

In July 1997, Sinkler was hired by Midwest to work at its Illinois Beach Resort hotel, located in Zion, Illinois. At the time Sinkler was hired, neither she nor Midwest had determined what duties she would be required to perform. Therefore, Midwest never provided Sinkler with a description of the job of sales manager, the position she ultimately assumed. When she began work, Sinkler found that one of her responsibilities would be to travel throughout Illinois. Concerned about her ability to market the hotel throughout the state, she told her supervisor Geri Patterson that she "had a problem driving" and that she might need help to "work that out." Patterson told Sinkler that they would "work together for a while," so that Sinkler could grow comfortable with the area that she would be required to service.

Shortly thereafter, the hotel's general manager, Steve Waak, asked Sinkler to travel to Chicago on a sales trip. Sinkler informed Waak that she would be unable to make this drive, and he approved her request to take a train instead. Later that year, Patterson asked Sinkler to travel with her to Springfield, Illinois, on a business trip. Sinkler asked Patterson to drive on this trip because Sinkler felt that she would be unable to drive that distance. Patterson indicated that she was willing to drive them both to Springfield, but Sinkler did not make the trip. She was not required to travel to Springfield because Waak decided that she needed

to remain at the hotel for other reasons.

In November 1997, Drew Lombardo, a limited partner in Midwest and director of the corporate entity that was Midwest's general partner, asked Renee Shrewsbury to visit the hotel and to uncover and report any problems that existed there. During her week stay at the hotel, Shrewsbury and Sinkler spoke once or twice about whether Sinkler could take a business trip to Springfield. Sinkler told Shrewsbury that she was afraid to drive to Springfield and asked if she would be permitted to fly there. Shrewsbury told her that Lombardo would not pay for her to fly. Later that week, Patterson, Midwest comptroller Cheryl Overton, Shrewsbury and Sinkler met for a brainstorming session. During the meeting, Sinkler again told Shrewsbury that she was unable to drive to Springfield because she was "really handicapped with that." She told Shrewsbury that if she and Patterson traveled together and Sinkler grew familiar with the route, then she might subsequently be able to make the trip by herself. Shrewsbury reported the details of these conversations to Lombardo, who remarked that he also had heard that Sinkler was afraid to drive.

In late November, with Patterson's permission, Sinkler engaged in competitive shopping of surrounding hotels. The purposes of this activity were to acquire referral business and to determine the rates these hotels offered and the quality of service the competition provided. Around this time, Sinkler also believed that she would be more efficient if she had access to a computer. Sinkler arranged with an acquaintance to have an unused computer owned by the hotel programmed for her use. In return, Sinkler treated the programmer to dinner at the hotel. Patterson authorized both the idea of setting up the computer and the idea of giving the programmer a free dinner. Nonetheless, Lombardo was unhappy with the decision to install new software on the computer.

On November 26, 1997, Sinkler participated in a conference call with Lombardo, Shrewsbury and others. During the call, Sinkler referred to the conference call as a "waste of time," and this infuriated Lombardo. Immediately after the conference call, he decided to fire Sinkler. On December 4, Sinkler entered her office and found Lombardo there holding her personal belongings. Lombardo told her that he was firing her and blamed the firing on her "lying" to him by failing to tell him that she was handicapped. Lombardo also justified the firing on his displeasure with the decision to swap software installation for a free dinner at the hotel, his belief that her job did not require competitive

shopping and on undocumented conflicts between Sinkler and her co-workers.

After her termination, Sinkler obtained a part-time sales position at Sears in Kenosha. This position did not require her to drive in unfamiliar areas. Sinkler filed a complaint against Midwest in federal district court, alleging that Midwest had discriminated against her by basing her termination on her condition and by refusing to make accommodations that would allow her to work despite her condition. Midwest filed a motion for summary judgment, seeking dismissal on the ground that Sinkler was not a qualified individual with a disability within the meaning of the ADA. Sinkler replied to this motion, and both parties supplemented their motions with affidavits.

The district court granted Midwest's motion for summary judgment. The court observed that both parties had stipulated to Sinkler's impairment but found that this impairment did not substantially limit Sinkler's ability to work. The court based this finding on Sinkler's thirty years of prior work experience. Challenging the district court's characterization of the major life activity that her condition impaired, Sinkler asks us to reverse the district court's grant of summary judgment.

II.  Analysis

A.  Standard of Review

We review de novo the district court's grant of summary judgment, drawing our own conclusions of law and fact from the record before us. See Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 789 (7th Cir. 1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether there exists any genuine issue of material fact, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) (citation omitted).

B.  Sinkler's Disability

        The ADA prohibits employer discrimination against an employee on the basis of a disability. 42 U.S.C. sec. 12112(a). However, to make a prima facie case for discrimination, Sinkler must demonstrate that her condition qualifies as a disability within the meaning of the ADA. See Feldman, 196 F.3d at 789. The statute defines disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. sec. 12102(2). If Sinkler's condition does not rise to the level of a disability as defined by the act, then she cannot recover even if Midwest terminated her expressly because of her condition. See Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). Moreover, if Sinkler's condition fails to fall within the definition of impairment set forth in sec. 12102(2)(A), she cannot assert that Midwest terminated her because she had a record of that condition. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 510 n. 7 (7th Cir. 1998) ("What 12102(2)(B) requires is not simply a diagnosis, but a record reflecting the kind of impairment that would impose a substantial limitation on one or more of the plaintiff's major life activities."); 29 C.F.R. sec. 1630.2(k).

        In Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 2202 (1998), the Supreme Court identified a three-step test to determine if a physical or mental condition met subsection (A) of the definition of disability. First, we must determine whether the condition claimed was a physical or mental impairment. See id. Second, "we identify the life activity upon which [Sinkler] relies . . . and determine whether it constitutes a major life activity under the ADA." Id. Third, we determine whether the impairment substantially limited this major life activity. See id. Midwest concedes that Sinkler's driving phobia constitutes an impairment, so we focus on the substance of Sinkler's complaint, which is that her impairment substantially limits a major life activity.

1.  Major Life Activity

        Applying the second step of the Bragdon test, we isolate the major life activity affected by

Sinkler's impairment. An ADA claimant must specify which major life activity has been limited; only those grounds specifically raised will be considered on appeal. See Bragdon, 118 S.Ct. at 2205 (restricting analysis of whether HIV is an ADA disability to its limitation of reproduction because "the case has been treated as one in which reproduction was the major life activity limited by the impairment," and "[i]t is our practice to decide cases on the grounds raised"). Equal Employment Opportunity Commission regulations interpreting the ADA define "major life activities" by providing a list that includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. sec. 1630.2(i).

Rather than "enunciating a general principle for determining what is and is not a major life activity," the ADA regulations provide "a representative list," which is intended to be "illustrative, not exhaustive." Bragdon, 118 S.Ct. at 2205. When analyzing whether an unlisted activity constitutes a major life activity, "the touchstone for determining an activity's inclusion under the statutory rubric is its significance." Id. (internal citation omitted). According to this standard, we consider unlisted activities in contrast to listed activities to determine whether the unlisted activity has equal "significance." One standard by which significance has been judged is whether "the average person in the general population can perform [the activity] with little or no difficulty." Pack v. Kmart Corp., 166 F.3d 1300, 1305 (10th Cir. 1999). However, when considering an activity's significance, we ask whether an activity is significant within the meaning of the ADA, not whether it is significant to a particular person. See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 642 (2d Cir. 1998).

In her memorandum in opposition to Midwest's motion for summary judgment, Sinkler identified "working" as the major life activity that her impairment affected. She stated that her "disability has created a major impact on her ability to work over the years because she can only hold jobs which will not require her to drive in unfamiliar places." Accordingly, the district court analyzed whether her impairment substantially limited her ability to work. The court found no substantial limitation and granted Midwest's motion for summary judgment. On appeal, Sinkler claims that the district court misunderstood which major life activity her impairment limited. She now argues that her phobia limits her major life functions of "getting to and from her work assignments, . . . .

thinking, concentrating, and basic personal
mobility."

Sinkler has never before raised the issues that
her phobia affects her ability to think,
concentrate or limit her "basic personal
mobility," so Sinkler has waived these claims.
See Hoeller v. Eaton Corp., 149 F.3d 621, 625
(7th Cir. 1998). In support of her contention
that commuting to and from work is a major life
activity, Sinkler cites dicta from other circuits
that extol the importance of timeliness to work
performance. See Lyons v. Legal Aid Soc'y, 68
F.3d 1512, 1516 (2d Cir. 1995) (noting that "an
essential aspect of many jobs is the ability to
appear at work regularly and on time"); Carr v.
Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) ("[A]n
essential function of any government job is an
ability to appear for work."). These statements
were made in the context of an ADA reasonable
accommodation analysis rather than ADA major life
activity analysis, and for this reason, they
provide little insight into whether commuting
should be considered an independent major life
activity. However, to the extent that such
statements are relevant, they suggest that
getting to and from work is important to
performance at work, but they do not suggest that
driving to work assignments is one of the "basic
functions of life." Knapp v. Northwestern Univ.,
101 F.3d 473, 479 (7th Cir. 1996). Because
working is a major life activity,/1 we
understand that, as a matter of law, the average
person must be able to get to and from work.
Nonetheless, in comparison with the major life
activity of working, or with any of the other
listed activities, we do not find commuting
equally significant. "Getting to and from work
assignments" is not a major life activity.
Rather, this task is either a sub-species of the
activity of "working" or of "driving."

Although the Second Circuit has concluded that
driving is not the type of endeavor that may be
characterized as a major life activity, see
Colwell, 158 F.3d at 643, we need not reach that
issue. We believe that the major life activity
that Sinkler describes has not changed. Instead,
she has merely attempted to re-characterize the
activity of "working" as a narrower activity of
"getting to and from work assignments" in the
hope that we will reach a more favorable
determination of the extent to which her
impairment limits this activity. We conclude that
"working" is the major life activity that Sinkler
claims her impairment limits, and we will
evaluate her claim of substantial limitation from
this perspective.

2. Substantial Limitation

The final step of the Bragdon test is to determine whether Sinkler's impairment set a substantial limit on her major life activity of working. See Bragdon, 118 S.Ct. at 2202. The district court found that because Sinkler was able to hold a broad range of other jobs, her inability to perform jobs that required travel to unfamiliar areas did not constitute a substantial limitation on her ability to work. Sinkler contends that the district court erred because her impairment constituted a significant barrier for her personal employment possibilities.

In the context of the major life activity of working, "'[s]ubstantially limits' means that a person is either '[u]nable to perform a major life activity' or is 'significantly restricted as to the condition, manner or duration' under which the individual can perform the major life activity as compared to the average person in the general population." Skorup, 153 F.3d at 514 (quoting 29 C.F.R. sec. 1630.2(j)(1)). However, "an inability to perform a particular job for a particular employer" is insufficient to establish substantial limitation. Byrne v. Board of Educ., 979 F.2d 560, 565 (7th Cir. 1992). Instead, "the impairment must substantially limit employment generally." Id. While we note that substantial limitation must be mea-sured by considering Sinkler's particular impairment to determine whether it constituted a significant barrier to her employment, taking her unique circumstances into account, see id., Sinkler has the burden of presenting evidence to identify how her impairment limited an entire class or broad range of jobs. See Skorup, 153 F.3d at 515.

Sinkler has made two claims that demonstrate ways in which her phobia limits her ability to work: she was forced to turn down a promotion that would have required her regularly to drive to Milwaukee, and her phobia was the basis for her discharge from Midwest. Even viewed in the light most favorable to her, these facts do not show that Sinkler's phobia substantially limited her ability to work. The fact that Sinkler has been forced to decline promotions that would require her to travel regularly outside of her "comfort zone" suggests that Sinkler's impairment, when viewed in a light most favorable to Sinkler, restricts her from holding any job that would require her regularly to travel by car to areas unfamiliar to her. Assuming as we must that her termination from Midwest was based on her impairment, this fact also indicates that her impairment restricts her from taking sales jobs that require frequent travel by car to unfamiliar areas. Although many sales jobs require business travel to unfamiliar areas, we do not believe

that these jobs amount to a broad enough class to constitute a substantial limitation.

Many facts in the record demonstrate that a broad range of jobs remain open to Sinkler. As the district court noted, Sinkler was employed for thirty years in the Kenosha area prior to working for Midwest, and she has produced no evidence that she was impeded by her impairment in the performance of those jobs. Sinkler was able to find a job in sales after she was discharged by Midwest, and Sinkler presents no evidence of any limitation on her performance in that job. In addition, although Sinkler may be unable to accept employment that requires her to drive outside of the Kenosha area, she presents no evidence that she is unable to work for an employer located outside the Kenosha area. Sinkler's impairment does not prevent her from working for any employer which is easily accessible by public transportation or car-pool. This class of employers includes the large number of companies located in the Chicago and Milwaukee metropolitan areas. Finally, certain facts indicate that Sinkler's fear of unfamiliar places can be overcome. Sinkler told Midwest that if she could act as a passenger on trips to Springfield, then she might feel more comfortable with making the trip by herself. This indicates that Sinkler's impairment does not limit her from working for employers who require driving to places outside of her comfort zone, as long as Sinkler is first allowed to travel with other employees and become familiar with the trips she must make.

Sinkler did not provide the district court with sufficient evidence to conclude that her condition precludes her from taking any broad range of jobs, such as all sales jobs. For this reason, we find that her impairment does not substantially limit her major life activity of working and does not meet the definition of a disability under sec. 12102(2)(A).

3. Perception of Disability

Sinkler also argues both that her record of impairment led to her discharge, under sec. 12102(2)(B), and that Midwest discharged her because it perceived that she was disabled within the meaning of the ADA, under sec. 12102 (2)(C). Sinkler provides no evidence that the record of her impairment had any effect on her discharge, so we find no error in the district court's grant of summary judgment as to the sec. 12102(2)(B) claim. However, Sinkler claims that Drew Lombardo, the CEO of Midwest, told her that she was being fired because she had lied by not informing him that she was "handicapped."

Lombardo apparently felt that Sinkler's impairment constituted a handicap to her ability to perform the tasks required as regional sales manager, one of which appears to be frequent travel to unfamiliar areas.

To prevail on the sec. 12102(2)(C) claim that she was discriminated against by Midwest because it believed she was disabled, Sinkler must show that Midwest believed that she was unable to work in a particular class or broad range of jobs as required in the definition of disability under sec. 12102(2)(A). See Skorup, 153 F.3d at 515. Because we have found that Sinkler's specific phobia is not an impairment that substantially limits her ability to work, to defeat Midwest's motion for summary judgment Sinkler must show that Midwest believed her phobia limited the class of jobs that Sinkler could perform more broadly than her phobia actually limited her. Sinkler provides no evidence to demonstrate that Midwest believed that she was "disabled" within the definition of the ADA or that it believed her impairment would limit her ability to work at a broad range of jobs.

Sinkler claims that the evidence suggests that Midwest believed her unable to drive to and from work at all. Her testimony about Lombardo's statements does show, when viewed most favorably for the plaintiff, that Midwest fired her because of her impairment, that is her fear of driving to unfamiliar places. However, the evidence that she provides does not support the inference that Midwest believed her unable to commute to work generally. The hotel was located in Zion, Illinois, which is some eight miles from Kenosha, Wisconsin, but Midwest required Sinkler to drive from Kenosha to Zion to go to work. From these facts, we infer that Midwest knew that Sinkler drove every day to work. Because Midwest did not indicate that a history of tardiness or absenteeism was a basis for Sinkler's termination, we infer that Midwest found no problems with Sinkler's regular commute, only with her ability to drive to unfamiliar areas. Sinkler has presented no other evidence from which we reasonably may infer that Midwest believed Sinkler was incapable of driving at all. Her evidence only demonstrates that Midwest felt that she was incapable of performing the driving to unfamiliar areas which was required of a regional sales manager. We find that Midwest did not perceive Sinkler as having an impairment which would substantially limit her ability to perform any broad range of jobs.

III. Conclusion

We find that the district court did not err in determining that Sinkler claimed "working" to be the major life activity that her specific driving phobia substantially limited. We find no error in the district court's conclusion that Sinkler's specific phobia did not substantially limit her ability to work or in its conclusion that Midwest did not perceive Sinkler to be disabled. For these reasons, Sinkler's condition does not meet the definition of disability under the ADA. The district court's grant of summary judgment is

AFFIRMED.

/1 We note that the Supreme Court has recently expressed concern even over whether "working" should be considered a major life activity because of the inherent circularity of a claim made on this basis. See Sutton v. United Air Lines, Inc., ___ U.S. ___, 119 S.Ct. 2139, 2151 (1999); see also Schneiker v. Fortis Ins. Co., No. 99-1437, 2000 WL 10251, at *6 (7th Cir. Jan. 6, 2000). Nonetheless, until the Supreme Court definitively excludes working as a major life activity, we will follow the precedent of this circuit and regard "working" as a major life activity. See Skorup, 153 F.3d at 514-15; Weiler v. Household Fin. Corp., 101 F.3d 519, 524-25 (7th Cir. 1996).